UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| MICHAEL CARLSON, | ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) ) | No. 1:24-cv-13123-JEK |
| FRED BOWERS, in his official capacity as Warden of Federal Medical Center Devens, | ) ) ) | |
| Respondent. | ) ) ) | |

**MEMORANDUM AND ORDER ON RESPONDENT'S MOTION TO DISMISS AND PETITIONER'S CROSS-MOTION FOR SUMMARY JUDGMENT**

**KOBICK, J.**

In December 2024, Michael Carlson, an inmate in the custody of the Bureau of Prisons ("BOP"), brought this habeas petition under 28 U.S.C. § 2241 concerning his eligibility to earn time credits under the First Step Act of 2018 ("FSA"), Pub. L. No. 115-391, 132 Stat. 5194 (2018). Carlson contends that, under the plain text of the FSA, he should have earned time credits during the nearly one-year period between when he was sentenced and when he arrived at his BOP-designated prison facility to start serving his term of imprisonment. While his petition was pending, Carlson was transferred from a prison facility to a halfway house. One consequence of his transfer is that even if Carlson's interpretation of the FSA is correct, his eligibility for further time credits could not hasten his transition to a less restrictive setting while still in BOP custody or expedite his transfer from BOP custody to supervised release. Because this Court cannot redress any injury suffered by Carlson as a result of the alleged miscalculation of his time credits, and because Carlson is not experiencing sufficiently definite collateral consequences of any miscalculation, this Court must dismiss his habeas petition as moot.

## BACKGROUND

**I.      Statutory and Regulatory Framework.**

The First Step Act directed the Bureau of Prisons to develop and release a "risk and needs assessment system" designed to assess prisoners' risk of recidivism and assign them to appropriate evidence-based recidivism reduction ("EBRR") programs or productive activities ("PAs"). *See* 18 U.S.C. § 3632. Congress also required the BOP to "develop additional policies to provide appropriate incentives for successful participation and completion of [EBRR] programming," such as increased phone and visitation privileges, transfers to preferred institutions and housing units, and the opportunity to earn so-called FSA time credits. *Id.* § 3632(d); *see* 28 C.F.R. § 523.42.

In general, a prisoner who "successfully completes" EBRR programs or PAs is eligible to earn FSA time credits unless they are serving a sentence for one of the crimes enumerated in Section 3632(d)(4)(D). *See* 18 U.S.C. § 3632(d)(4). By default, an eligible prisoner earns 10 FSA time credits for every 30 days of successful participation in EBRR programs or PAs. *Id.* § 3632(d)(4)(A)(i). However, a prisoner whom the BOP has determined "to be at a minimum or low risk for recidivating, who, over 2 consecutive assessments, has not increased their risk of recidivism," earns 15 FSA time credits, rather than 10 credits, for every 30 days of successful participation in EBRR programs or PAs. *Id.* § 3632(d)(4)(A)(ii). The BOP must "provide all prisoners with the opportunity to actively participate" in EBRR programs and PAs "throughout their entire term of incarceration." *Id.* § 3621(h)(6).

FSA time credits may, subject to certain conditions, be applied "toward time in prerelease custody or supervised release." *Id.* § 3632(d)(4)(C). If the prisoner has been sentenced to a term of supervised release, "the Director of the [BOP] may transfer the prisoner to begin any such term of supervised release at an earlier date, *not to exceed 12 months*, based on the application of [FSA]

time credits." *Id.* § 3624(g)(3) (emphasis added). There is no limit to the number of FSA time credits that can be applied toward time in prerelease custody. *See id.* § 3624(g)(10).

There are two circumstances in which an otherwise eligible prisoner who completes EBRR programs or PAs "may not earn time credits": (1) where the prisoner completed programming prior to the enactment of the FSA, and (2) "during official detention prior to the date that the prisoner's sentence commences under section 3585(a)." *Id.* § 3632(d)(4)(B). Section 3585(a), in turn, provides that "[a] sentence to a term of imprisonment commences on the date that the defendant is received in custody awaiting transportation to, or arrives voluntarily to commence service of sentence at, the official detention facility at which the sentence is to be served." *Id.* § 3585(a).

Following the enactment of the FSA, BOP "implemented regulations codifying its procedures regarding the earning and application of time credits under the FSA." *Patel v. Barron*, No. 23-cv-937-JHC-MLP, 2023 WL 6319416, at *3 (W.D. Wash. Sept. 5, 2023). In accordance with Section 3632(d)(4)(B)(ii), the regulation governing the procedure for earning FSA time credits provides that an "eligible inmate begins earning FSA Time Credits after the inmate's term of imprisonment commences." 28 C.F.R. § 523.42(a). The regulation then states that a term of imprisonment "commences" on "the date the inmate arrives or voluntarily surrenders at the designated Bureau facility where the sentence will be served." *Id.*

**II.     Factual and Procedural Background.**

On April 23, 2020, the U.S. District Court for the District of South Dakota sentenced Carlson to 120 months in prison followed by 60 months of supervised release. ECF 2, at 2; *see* ECF 13, ¶ 4. The BOP designated Federal Correctional Institute ("FCI") Pekin, which is located in Illinois, as the institution where Carlson would serve his sentence. ECF 13, ¶ 19. Due to the then-nascent COVID-19 pandemic, however, Carlson did not arrive at FCI Pekin until March 29,

2021, nearly a year after he was sentenced. *See* ECF 2, at 2; ECF 13, ¶ 19. Between the date of his sentencing and his arrival at FCI Pekin, Carlson was incarcerated at two county jails and two privately operated detention facilities. *See* ECF 27, ¶ 5; ECF 19, at 4-6. The BOP did not have a contract or official association with any of these facilities, and Carlson remained in the custody of the U.S. Marshals throughout this period. ECF 27, ¶ 6.

Carlson began earning FSA credits when he arrived at FCI Pekin. ECF 13, ¶ 23. Just over two years later, on May 1, 2023, Carlson was transferred to United States Penitentiary ("USP") Thomson, another federal detention facility in Illinois. *Id.* Carlson was transferred again three months later, departing USP Thomson on August 17, 2023 and arriving at Federal Medical Center ("FMC") Devens, which is in Massachusetts, on August 31, 2023. *Id.* ¶ 24. The BOP deemed Carlson ineligible to earn FSA time credits while in transit between USP Thomson and FMC Devens, but he resumed earning FSA time credits upon his arrival at FMC Devens. *Id.*

Carlson's statutory release date—that is, the date when he will complete his term of imprisonment and commence his term of supervised release—is September 30, 2027. *Id.* ¶ 25; ECF 13-1. Carlson has earned more than 365 FSA time credits, which is the maximum number of credits that can be applied toward an early transfer to supervised release. ECF 13, ¶¶ 25-26; *see* 18 U.S.C. § 3624(g)(3). His projected release date, based on the application of those credits, is September 30, 2026. ECF 13, ¶ 25. On April 30, 2025, Carlson was transferred from FMC Devens to a residential reentry center. ECF 27, ¶ 3. Otherwise known as a "halfway house," a residential reentry center is a less restrictive setting than a prison, but still constitutes incarceration in BOP custody. *See Muniz v. Sabol*, 517 F.3d 29, 31 n.1 (1st Cir. 2008) ("[Community corrections centers] are also referred to as Residential Re-entry Centers (RRCs) or, more familiarly, 'halfway houses.'"); *Goldings v. Winn*, 383 F.3d 17, 26 (1st Cir. 2004) ("Since a community corrections

4

facility is clearly a corrections facility . . . , the BOP may place *prisoners* there prior to the lesser of the last six months or ten percent of their terms of *imprisonment*." (emphases altered)).

On December 16, 2024, Carlson filed a *pro se* petition for habeas corpus pursuant to 28 U.S.C. § 2241 in this Court, naming Fred Bowers, the warden of FMC Devens, as the defendant. ECF 1. The petition alleges that the BOP unlawfully denied Carlson FSA time credits to which he is entitled under 18 U.S.C. § 3632 between the date of his sentencing on April 23, 2020, and the date of his arrival at FCI Pekin on March 29, 2021. *Id.* at 6-7. In a memorandum accompanying the petition, Carlson contends that BOP's regulation specifying that a term of imprisonment "commences" on "the date the inmate arrives or voluntarily surrenders at the designated Bureau facility where the sentence will be served," 28 C.F.R. § 523.42(a), is inconsistent with the FSA, which provides that "a term of imprisonment commences on the date that the defendant is received in custody awaiting transportation to, or arrives voluntarily to commence service of sentence at, the official detention facility at which the sentence is to be served," 18 U.S.C. § 3585(a). *See* ECF 2, at 1, 3-4. Carlson's petition asks the Court to order the BOP to recalculate his FSA time credits starting from the date of his sentencing, to order his immediate release, and to enjoin the BOP from calculating FSA time credits in the manner prescribed by 28 C.F.R. § 523.42(a). ECF 1, at 8.

The government filed a motion to dismiss the petition in February 2025, ECF 11, which Carlson opposed, ECF 19. Concurrent with the filing of his opposition in April 2025, Carlson filed a cross-motion for summary judgment, *id.*, and, citing the complexity of the legal issues raised by his petition, a motion seeking appointment of counsel, ECF 20. In opposing Carlson's motion for summary judgment in May 2025, the government contended, among other things, that his petition had become moot because he had been transferred to a residential reentry center on April 30, 2025. ECF 26, at 1-2. Even if Carlson had been entitled to FSA time credits for the period between his

5

sentencing and arrival at FCI Pekin, the government argued, those time credits could only have been applied to the time period before his transfer to the residential reentry center. *Id.* at 2. His transfer, in the government's view, ended any case or controversy between the parties. *Id.*

Shortly after receiving the government's opposition, the Court scheduled a hearing on the motions and appointed counsel for Carlson pursuant to the Criminal Justice Act, 18 U.S.C. § 3006A(a)(2)(B). *See* ECF 28, 29. With leave of Court, Carlson's counsel filed a supplemental brief in opposition to the government's motion to dismiss. ECF 38. The supplemental brief contended that even though the additional FSA time credits could not, at that point, hasten Carlson's transfer to a residential reentry program or the commencement of his term of supervised release, the petition was not moot because Carlson was still experiencing the collateral consequences of being denied FSA time credits for the period between his sentencing and arrival at FCI Pekin. *Id.* at 2-4. Following a hearing on July 8, 2025, the Court took the parties' motions under advisement, ECF 39, and the parties stipulated that the government's motion to dismiss could be converted to a motion for summary judgment, ECF 40.

## DISCUSSION

The government contends that Carlson's petition became moot when he was transferred to a residential reentry center in April 2025 and, as a result, obtained all the relief for which he is eligible under his reading of the FSA. "Article III of the Constitution grants the federal judiciary the authority to adjudicate cases and controversies, but that authority extends only to live cases and controversies, not to those which are or have become moot." *In re Sundaram*, 9 F.4th 16, 18 (1st Cir. 2021) (internal citations omitted). In this regard, "the key question is 'whether the relief sought would, if granted, make a difference to the legal interests of the parties.'" *Corrigan v. Boston Univ.*, 98 F.4th 346, 352 (1st Cir. 2024) (quoting *Bos. Bit Labs, Inc. v. Baker*, 11 F.4th 3,

8 (1st Cir. 2021)); *cf. ConnectU LLC v. Zuckerberg*, 522 F.3d 82, 88 (1st Cir. 2008) ("An appeal becomes moot if an intervening event strips the parties of any legally cognizable interest in the outcome."). As the party seeking dismissal of Carlson's petition, the government carries the "heavy" burden to show that his petition is moot. *Corrigan*, 98 F.4th at 352.

      The parties agree that, in light of Carlson's transfer to the residential reentry center in April 2025, his eligibility for FSA time credits cannot now affect his placement or duration in BOP custody. That conclusion follows from the text and structure of the FSA. First, even if Carlson were correct that he was eligible to earn FSA time credits for the time period between his sentencing and his arrival at FCI Pekin, those additional credits could not shorten his term in BOP custody. That is so because while the FSA does not cap the number of time credits that a prisoner may *earn*, *see* 18 U.S.C. § 3632(d)(4), it does cap the number of time credits that a prisoner can *apply* toward an early transfer to supervised release, *see id.* § 3624(g)(3). Section 3624(g)(3) provides that "the Director of the [BOP] may transfer the prisoner to begin any such term of supervised release at an earlier date, not to exceed 12 months, based on the application of time credits under section 3632." *Id.* In other words, no matter how many FSA time credits a prisoner amasses, he cannot start his term of supervised release more than one year earlier than scheduled. Despite being denied the opportunity to earn FSA time credits before his arrival at FCI Pekin, Carlson has already earned more than 365 credits—the maximum he can put toward an early transfer to supervised release. ECF 13, ¶ 25. Based on the application of FSA time credits, Carlson is scheduled to be released from incarceration and commence his term of supervised release one year early, on September 30, 2026. *See id.* Thus, even if this Court were to grant Carlson's petition and order the BOP to retroactively award him FSA time credits for the period between the dates

of his sentencing and his arrival at FCI Pekin, those credits could not further expedite Carlson's transition to supervised release. *See* 18 U.S.C. § 3624(g)(3).

Second, even if Carlson were retroactively awarded FSA time credits for the time between his sentencing and his arrival at FCI Pekin, those credits could not now hasten his transition to a prerelease custody program. While there is no limit on the number of FSA time credits that a prisoner can put toward time in prerelease custody, *id.* § 3624(g)(10), Carlson made his transition to prerelease custody in April 2025 when he entered the residential reentry center, ECF 27, ¶ 3. Even if the date of Carlson's transfer to the residential reentry center was delayed because he was unable to earn FSA time credits before arriving at FCI Pekin, the Court could not, at this point, afford him effective relief from that delay. *See Am. Civ. Liberties Union of Mass. v. U.S. Conf. of Cath. Bishops*, 705 F.3d 44, 52 (1st Cir. 2013) ("[A] case is moot when the court cannot give any 'effectual relief' to the potentially prevailing party." (quotation marks omitted)).

Carlson nevertheless contends that his petition presents a live controversy, and should not be dismissed as moot, because a favorable decision will strengthen a future motion seeking early termination of supervised release under 18 U.S.C. § 3583(e)(1) or seeking a modification to his conditions of supervised release under 18 U.S.C. § 3583(e)(2). A party can defend against an assertion of mootness where it "can demonstrate that a lower court's decision, if allowed to stand, may have collateral consequences adverse to its interests." *ConnectU LLC*, 522 F.3d at 88. On Carlson's reading of the FSA, he should have received more FSA time credits that would, in turn, have rendered him eligible for a transfer to a residential reentry program months before his April 2025 transfer. In the future, he contends, a court may look more favorably on a motion for early termination of supervised release or a motion to modify his conditions of supervised release

8

because he was denied the opportunity for an earlier transition from an institutional penal environment to a halfway house while in BOP custody.

In support of this argument, Carlson relies principally on *United States v. Reyes-Barreto*, in which the First Circuit held that a criminal defendant's appeal of his sentence was not mooted by his release from incarceration. 24 F.4th 82, 85-86 (1st Cir. 2022). The Court reasoned that although the defendant had completed his term of imprisonment, he "absolutely ha[d] a stake in the outcome" of his appeal because, if the Court were to agree that his "sentence was unreasonable, he could seek equitable relief by way of a motion to modify the terms of his supervised release." *Id.* Indeed, the Supreme Court had noted in *United States v. Johnson* that although a defendant cannot directly credit excess time served in prison toward a subsequent term of supervised release, he can cite that excess time as the basis for a motion to reduce or modify his supervised release. 529 U.S. 53, 60 (2000).

Unlike this case, however, *Reyes-Barreto* involved a defendant who contended that the length of his sentence was unreasonably long. 24 F.4th at 84-86. "'There can be no doubt,'" the First Circuit explained, "'that equitable considerations of great weight exist when an individual is incarcerated beyond the proper expiration of his prison term,'" and the possibility of an early termination of supervised release or modification of the conditions of supervised release can account for that injustice. *Id.* at 86 (quoting *Johnson*, 529 U.S. at 60). Here, though, Carlson's reading of the FSA, even if correct, would not entitle him to an earlier release from his present incarceration in the BOP residential reentry center. Because Carlson earned the maximum number of FSA time credits that may be put toward an early transfer to supervised release without the pre-FCI Pekin credits to which he claims he is entitled, he could not transition more quickly from BOP custody to supervised release if his habeas petition were to be granted. *See* 18 U.S.C. § 3624(g)(3).

9

His argument therefore hinges on the more modest claim that a court considering a motion to modify or terminate supervised release would be swayed by the delay he experienced, on his reading of the FSA, in moving from FMC Devens to the residential reentry center.

This extension of *Reyes-Barreto* is too speculative to overcome Article III's case-or-controversy requirement. The decision whether to terminate or modify the terms of supervised release is within the sentencing court's discretion. *See Johnson*, 529 U.S. at 60. After a defendant has spent more than one year on supervised release, that court "may, after considering" many of the factors set forth in 18 U.S.C. § 3553(a), terminate supervised release "if it is satisfied that such action is warranted by the conduct of the defendant released and the interest of justice." 18 U.S.C. § 3583(e)(1). And it may modify the conditions of supervised release "at any time prior to the expiration or termination of the term of supervised release, pursuant to the provisions of the Federal Rules of Criminal Procedure relating to the . . . provisions applicable to the initial setting of the terms and conditions of post-release supervision." *Id.* § 3583(e)(2). In considering both motions, a court may weigh a range of equitable considerations. One consideration could be the fact that, as he sees it, Carlson spent excessive time in a more penal setting before transitioning to a residential reentry program because of the BOP's faulty reading of the FSA. But this consideration does not move Carlson's likelihood of success on a motion to terminate or modify the conditions of supervised release from the realm of mere "possibility" to the realm of "certainty or even a probability." *Spencer v. Kemna*, 523 U.S. 1, 14 (1998). This Court agrees with those Courts of Appeals which, in comparable circumstances, saw the possibility of relief on such motions as too speculative to surmount Article III's requirement of a live case or controversy. *See, e.g.*, *Herndon v. Upton*, 985 F.3d 443, 446-48 (5th Cir. 2021); *Rhodes v. Judiscak*, 676 F.3d 931, 935 (10th Cir.

2012); *Burkey v. Marberry*, 556 F.3d 142, 148-50 (3d Cir. 2009); *but see Mujahid v. Daniels*, 413 F.3d 991, 993-95 (9th Cir. 2005).

Accordingly, Carlson's habeas petition is not saved from mootness by the collateral consequences doctrine. Because it is more speculative than probable that this Court's ruling on the merits of Carlson's habeas petition could affect his rights in the future, and any opinion on whether 28 C.F.R. § 523.42(a) comports with 18 U.S.C. § 3585(a) would therefore be purely advisory, Carlson's petition must be dismissed as moot.

## CONCLUSION AND ORDER

For the foregoing reasons, the respondent's motion to dismiss, ECF 11, is GRANTED, and Carlson's motion for summary judgment, ECF 19, is DENIED. Carlson's habeas petition is DISMISSED as moot.

SO ORDERED.

/s/ Julia E. Kobick
JULIA E. KOBICK
UNITED STATES DISTRICT JUDGE

Dated: September 30, 2025